COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges Petty, Russell and Malveaux
Argued by videoconference


MICHAEL VECHERY

                                            MEMORANDUM OPINION* BY
v.       Record No. 0636-20-4               JUDGE MARY BENNETT MALVEAUX
                                            JUNE 15, 2021
FLORENCE COTTET-MOINE


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Jan L. Brodie, Judge Designate

Michael Vechery, *pro se*.

Sonja N. Aoun (Florence Cottet-Moine, *pro se*, Alexander E.
Morgan, Guardian *ad litem* for the minor child; Hartsoe & Morgan,
P.L.L.C., on brief), for appellee.


Michael Vechery ("father") appeals a custody and visitation order and a protective order

entered in favor of Florence Cottet-Moine ("mother") and their child by the Loudoun County

Circuit Court ("circuit court"). On appeal, in his eleven assignments of error, father argues that:

(1) the circuit court exceeded its jurisdiction in a custody and visitation proceeding in terminating

most of father's residual parental rights; (2) and (3) the circuit court used the wrong burden of proof

in terminating most of father's residual parental rights and this error violated father's Fourteenth

Amendment due process rights; (4) the circuit court's denial of all visitation and all other contact by

father with L.C.M. for two years and, thereafter prohibiting any contact or visitation by father with

L.C.M. except upon compliance with the conditions set forth in the final order, was beyond the

circuit court's jurisdiction in a visitation and custody proceeding, was without adequate support in

_____

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

the record, and violated father's fundamental Fourteenth Amendment due process right to raise his child; (5) the two-year protective order entered by the circuit court was unjustified by the evidence; (6) the two-year protective order entered by the circuit court was unreasonably disproportionate to the alleged harassing misconduct that father was found to have engaged in, amounted to an abuse of discretion, and constituted a violation of father's fundamental due process right to raise his child; (7) and (8) the circuit court erred as a matter of law and exceeded its discretionary authority under Code § 20-124.5 by ordering that, for good cause shown, mother need not comply at all with the statutory notice of relocation requirement; (9) the circuit court's findings that L.C.M.'s grades were "improving" and that she was "getting assignments completed" were plainly wrong and without evidence to support them; (10) the circuit court erred in failing to award any visitation whatsoever by father with L.C.M., where such visitation would be in L.C.M.'s best interests; and (11) the circuit court erred in awarding all of mother's attorney's fees and costs. For the following reasons, we affirm.[1]

## I. BACKGROUND

Because the parties are fully conversant with the record in this case and this memorandum opinion carries no precedential value, we recite below only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal. "In accordance with familiar principles of appellate review, we view the facts in the light most favorable to [mother], as the prevailing party below." Price v. Peek, 72 Va. App. 640, 644 n.1 (2020).

---

[1] Parts of the record in this case were sealed. "To the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

Mother and father are the parents to a child, L.C.M.,[2] born in 2005. On June 9, 2016, the circuit court entered a custody and visitation order ("2016 custody and visitation order") following father's petition for a change in physical custody and modification of his visitation with L.C.M. and mother's cross-petition to modify father's custody and visitation. Mother was awarded sole legal and primary physical custody of L.C.M. Father was awarded visitation every other weekend beginning at 3:00 p.m. or the end of the school day on Friday and ending at 6:00 p.m. on Sunday, visitation every Wednesday night beginning at 3:00 p.m. and ending at 9:00 a.m. the next day, and two consecutive weeks of visitation during the summer.

In August and October of 2018, father filed several motions in the juvenile and domestic relations district court ("JDR court") to amend custody and visitation by asking the court to award him full custody of L.C.M. The JDR court held hearings on November 2, 2018 and February 1, 2019 on father's motions to amend custody and visitation. In a February 1, 2019 order ("February 2019 JDR order"), the JDR court denied father's motion to amend custody. The court also amended father's visitation by ordering that he have no contact with L.C.M. for one month, and then have supervised visitation for no more than four to eight hours on Saturday and Sunday every other weekend. Father appealed the February 2019 JDR court to the circuit court.

Mother obtained a protective order for her and L.C.M. against father on December 23, 2019 in the JDR court. Father appealed this protective order, and this appeal was consolidated with father's appeal of the February 2019 JDR order.

In February 2020, the circuit court held a four-day trial on father's appeal of the February 2019 JDR order and the December 23, 2019 protective order.

---

[2] We use initials, instead of the child's name, to protect her privacy.

On February 20, 2020, the circuit court issued its ruling from the bench, and on March 4, 2020, issued its final order that reflected these rulings.

As for custody and visitation, the court stated that it had considered all of the factors listed in Code § 20-124.3 and then addressed several of those factors in detail. The court found that it was in L.C.M.'s best interests for mother to have sole legal and physical custody with "no visitation, for now, with the father." The court ordered that father have no contact with L.C.M., including through third parties. Father was prohibited from contacting L.C.M. by telephone or social media. Father was not permitted to attend any activities or events where L.C.M. was a participant or any place she was known to be present, and he was not to post any material related to L.C.M. online. Father would not have access to L.C.M.'s medical records, but mother would present him with L.C.M.'s medical bills. He would be allowed to access L.C.M.'s "quarterly and annual progress reports" but none of her other academic records, and was prohibited from communicating with any of L.C.M.'s school administrators, teachers, or coaches.

The court granted mother's request for a prefiling injunction that prohibited father from filing anything related to custody and visitation of L.C.M. without the court's permission. To obtain permission to file such a pleading, father would have to satisfy certain conditions that would "be used as a threshold to determine whether a material change in circumstances ha[d] occurred": father had to complete a new anger management program with a certified therapist; father had to start individual therapy and sign a release for his individual therapist to speak with L.C.M.'s therapist and mother; only after father's therapist had determined that he had shown significant progress could father proceed with reunification efforts; a reunification therapist would communicate with L.C.M.'s therapist to assess the risk to L.C.M. and her wishes as part of the reunification process; father's therapist and the reunification therapist would have to agree in writing that father was ready to appropriately engage with L.C.M. in a manner that would not

have a negative impact on her mental health; father's mental health records would be subject to discovery; and father would be solely responsible for all costs associated with his individual therapy, the reunification therapist, and any related costs of L.C.M.'s therapist. Once father had satisfied these requirements, if "the [c]ourt deem[ed] [father's filing] not to be frivolous and/or not filed for the purpose of harassing [m]other, [L.C.M.], or this [c]ourt," father's filing related to custody and visitation could be set for hearing.

On the appeal of the protective order, the court granted mother's request for a protective order against father for her and L.C.M. The order stated that father would have no contact with L.C.M. "except as ordered by [the] circuit court or court of competent jurisdiction." The court also ordered that, pursuant to Code § 20-124.5, father had to provide thirty days advance written notice to the court and mother of any intention to relocate and of any intended change of address, but "[f]or good cause shown, namely, issuance of the aforementioned Protective Order against Father, Mother is not required to comply with these provisions."

Father was ordered to pay mother's attorney's fees in the amount of $83,740, in addition to an award of attorney's fees from May 29, 2019 in the amount of $2,725, which father had not paid, for a total of $86,465.

Father appealed the circuit court's March 4, 2020 final order.

## II. ANALYSIS

### A. "Termination" of Parental Rights[3]

On appeal, father argues that the circuit court was without jurisdiction in terminating most of his residual parental rights in a custody and visitation proceeding and also that it used the wrong burden of proof in terminating those rights.

---

[3] We address father's assignments of error one through four in this section of the analysis.

"The termination of parental rights is a grave, drastic, and irreversible action.  When a court orders termination of parental rights, the ties between the parent and child are severed forever, and the parent becomes 'a legal stranger to the child.'"  Lowe v. Dep't of Pub. Welfare of the City of Richmond, 231 Va. 277, 280 (1986) (quoting Shank v. Dep't of Soc. Servs., 217 Va. 506, 509 (1976)).  Subsections (B) and (C) of Code § 16.1-283 govern the termination of parental rights.  Each requires proof of certain factors necessary to terminate parental rights under a "clear and convincing evidence" standard.  Id. at 281.  In contrast, "the party seeking a modification of the existing child custody order[] ha[s] 'the burden of proving, by a preponderance of the evidence, a material change in circumstances justifying a modification of the decree.'"  Ohlen v. Shively, 16 Va. App. 419, 424 (1993) (quoting Yohay v. Ryan, 4 Va. App. 559, 565-66 (1987)).

The arguments advanced by father are based upon a faulty premise—that the circuit court's order disallowing visitation with father until he met certain conditions constituted a termination of his parental rights.  In the instant case, the circuit court heard father's appeal from the February 2019 JDR custody and visitation order that father had initiated by his filing petitions to change custody and visitation of L.C.M.  Nothing in the circuit court's order regarding custody and visitation indicates that father has become a legal stranger to L.C.M. or that their ties have been permanently severed by the court's directives.  To the contrary, it is clear from the court's oral ruling and written order that the court was prohibiting contact between father and L.C.M. at the time of the order, but that the court would consider reunification of father and L.C.M. upon the completion of certain requirements.  The circuit court explicitly provided father with a path for reunification with L.C.M.—father must attend therapy and have his therapist determine that he has made "significant progress," which would be considered a material change in circumstance by the court.  At that point, father could petition the court to

allow him to file a pleading related to the resumption of visitation with L.C.M. As the court did not foreclose the possibility that father would ever again be awarded visitation with L.C.M., we conclude that the court's order did not constitute a termination of father's parental rights under Code § 16.1-283 and thus reject father's arguments on that ground.

Father further argues that the circuit court's denial of all visitation except upon compliance with the conditions set forth in the final order violated his fundamental Fourteenth Amendment due process right to raise his child.

Our Supreme Court has previously acknowledged that "the relationship between a parent and child is constitutionally protected by the Due Process Clause of the Fourteenth Amendment." Copeland v. Todd, 282 Va. 183, 198 (2011). However, "[c]ustody and visitation disputes between two fit parents involve one parent's fundamental right pitted against the other parent's fundamental right. The discretion afforded trial courts under the best-interests test, Code § 20-124.3, reflects a finely balanced judicial response to this parental deadlock." Griffin v. Griffin, 41 Va. App. 77, 83 (2003). Even in cases involving a dispute between two fit parents, when fit parents assert their constitutional rights against each other, neither parent is entitled to primacy over the other. "Thus, faced with a contest in which one parent's fundamental rights [are] pitted against the other parent's fundamental rights," the circuit court does not err by deciding the case based solely on the best-interests standard. Yopp v. Hodges, 43 Va. App. 427, 439 (2004). In the instant case, as explained below, the circuit court properly utilized the best-interests standard, and in doing so did not violate father's constitutional rights.

### B. Lack of Visitation Not in Child's Best Interest[4]

Father also argues that the circuit court erred in failing to award any visitation by father with L.C.M. when visitation would be in the child's best interests.

---

[4] We address father's assignments of error nine and ten in this section of the analysis.

"A trial court's determination with regard to visitation is reversible only upon a showing that the court abused its discretion." Stadter v. Siperko, 52 Va. App. 81, 88 (2008). "Where the record contains credible evidence in support of the findings made by that court, we may not retry the facts or substitute our view of the facts for those of the trial court." Ferguson v. Stafford Cnty. Dep't of Soc. Servs., 14 Va. App. 333, 336 (1992).

"The court, in the exercise of its sound discretion, may alter or change custody or the terms of visitation when subsequent events render such action appropriate for the child's welfare." Eichelberger v. Eichelberger, 2 Va. App. 409, 412 (1986). "When a trial court has entered a final custody and visitation order, it cannot be modified absent (i) a showing of changed circumstances under Code § 20-108 and (ii) proof that the child's best interests under Code § 20-124.3 will be served by the modification."[5] Petry v. Petry, 41 Va. App. 782, 789 (2003) (footnote omitted); see also Duva v. Duva, 55 Va. App. 286, 291 (2009).

Code § 20-124.3 lists ten factors for a court to consider "[i]n determining best interests of a child for purposes of determining custody or visitation arrangements." "Although a circuit court must consider the statutory factors found in Code § 20-124.3, it determines how to weigh those factors and 'is not required to quantify or elaborate exactly what weight or consideration it has given to each[.]'" Wynnycky v. Kozel, 71 Va. App. 177, 201 (2019) (alteration in original) (quoting Brown v. Brown, 30 Va. App. 532, 538 (1999)). Moreover, "[o]n appeal, we do not reweigh the factors to see if we would have reached a different conclusion." Id. Accordingly, "unless the court fails to consider the required statutory factors or applies an incorrect legal standard, [its] decision as to whether a change in custody [or visitation] would be in the best

---

[5] On appeal, father does not argue that the evidence failed to demonstrate a change in circumstances. Instead, he challenges only the circuit court's determination that a modification of visitation was in L.C.M.'s best interests.

interests of the child is reversible . . . only if 'plainly wrong or without evidence to support it.'"
Surles v. Mayer, 48 Va. App. 146, 172 (2006) (quoting Yopp, 43 Va. App. at 439).

In this case, the circuit court gave detailed reasoning, based on its evaluation of the Code § 20-124.3 factors, as to its determination that it was in L.C.M.'s best interests to have no visitation with father until he completed therapy and his therapist opined that reunification was appropriate. Because the circuit court's factual findings are supported by evidence in the record, we conclude that the court did not abuse its discretion in ordering no visitation with L.C.M. by father until father met certain requirements.

In its discussion of factor one, the age and physical and mental condition of the child, the court noted that L.CM. was an intelligent child with a mature demeanor. The court stated that L.C.M. seemed to manage the ongoing conflict and litigation between her parents by "modifying her responses and behavior to fit who she [wa]s with at the time, saying what would be expected to make her father happy." The court also noted that that L.C.M. had transitioned that year from a small private grade school to a large public high school and that while she had D and F grades her freshman year, her "grades [wer]e improving and she [wa]s getting assignments completed."[6] In regard to factor eight, the reasonable preference of the child, the court noted that L.C.M. stated that "her relationship with her mother was great," that she did not feel "as free" in her relationship with father, and that she did not want to see her father at that time.

---

[6] Father assigns error to the circuit court's finding that L.C.M.'s grades were improving and that she was getting her assignments completed, noting that L.C.M. continued to get Ds and Fs on her report card for the second marking period of high school and that she received an "incomplete" in English for not completing assignments. However, a review of L.C.M.'s high school grades introduced at trial shows that on November 15, 2019, L.C.M. had two Fs, a D-plus, two D-minuses, a C, and an A. On January 17, 2020, L.C.M. had an incomplete, one F, a D-plus, a C, an A-minus, an A, and an A-plus. Thus, while L.C.M. still had an incomplete and a failing grade on her grade sheet at the time of trial, her other grades were improving. Further, mother testified that at the time of trial L.C.M. had completed all of her assignments.

Regarding factor two, the age and physical and mental condition of each parent, the court noted that both mother and father seemed to be in good physical and mental health. However, Dr. Ling, a licensed clinical psychologist who performed a custody evaluation for the parties, had found father easily reactive and wounded if others provided feedback that was critical of him or contrary to his self-interests. The court noted Dr. Ling's testimony that father tended to exaggerate his own positive attributes while indicating that L.C.M.'s gifts and academic achievements were a direct result of his own work with her. The court further noted that father repeatedly discredited any professional that did not concur with his position, including Dr. Ling and L.C.M.'s therapist, Dr. Hoffmann, and was unable to work with any of the court-appointed visitation supervisors.

In regard to factor three, the relationship existing between each parent and the child, factor four, the needs of the child, and factor five, the role that each parent has played and would play in the upbringing and care of the child, the court found "that both parents care about their daughter and want to be involved in her life." However, "the [c]ourt [wa]s concerned that the father continued to discuss this case, despite repeated orders from the [c]ourt that the parents not discuss it with her." In contrast, mother did not discuss the case with L.C.M. The court also noted Dr. Ling's concerns with father's highly intrusive engagement with L.C.M. and the resulting effect on L.C.M.'s psychological development. The court found that father had helped L.C.M. study and did work with her in golf, resulting in much success for her. The court stated that father's witnesses testified, in their opinion, that he was a good father, although they were unaware of some of the negative actions of father and had not had recent contact with L.C.M. The court also found that father did not appear to understand how embarrassed L.C.M. was by his social media postings about her, despite her requests that he remove the posts. The court also noted that father had engaged in a fight with the father of one of L.C.M.'s friends and confronted

her basketball coach in a school parking lot despite L.C.M.'s presence. The court further stated that father had "repeatedly violated the [c]ourt's orders," including "at one point, in July 2018, refusing to tell the [c]ourt where [L.C.M.] was." The court pointed out that father had suggested that L.C.M. assault her guardian *ad litem* ("the GAL") and had her read Dr. Ling's extensive report regarding custody. The court also noted that father had "cruelly demeaned [L.C.M.] by saying he had wasted ten years on her." Based on this evidence, the court was "convinced . . . that [father] ha[d] little understanding of [L.C.M.'s] current needs and how his conduct has and would affect her" and "that . . . mother [wa]s better able to accurately assess and meet [L.C.M.'s] emotional, intellectual, and physical needs."

As for factor six, the propensity of each parent to actively support the child's contact and relationship with the other parent, and seven, the ability of each parent to cooperate in and resolve disputes regarding matters affecting the child, the court found that the parents were totally unable to co-parent at that time. The court noted that father "actively worked to interfere with [L.C.M.'s] relationship with her mother by focus[ing] more on litigation and groundless accusations rather than actually making an effort to work with her for [L.C.M.'s] benefit." The court found that the evidence was clear that L.C.M. was the one who did not want to see father, despite mother's efforts that she have visitation with father to the extent that mother even called the police for assistance. Regarding factor nine, history of abuse, the court noted that although father had filed numerous reports with CPS claiming abuse by mother, none of the reports were substantiated and there were no findings of abuse. In addition, Dr. Ling's testing did not indicate that L.C.M. displayed the specific symptoms that are consistent with a child who has been abused and/or neglected by her mother.

After this discussion of the Code § 20-124.3 factors, the court concluded that it was in L.C.M.'s best interests that mother have sole legal and physical custody with no visitation "for

- 11 -

now" with father, and provided that father could petition for visitation once he had made progress in reunification therapy.

In the instant case, both orally and in writing, the circuit court detailed its consideration of the statutory factors, how it weighed those factors, and the pieces of evidence upon which it relied in drawing its ultimate conclusions based on those factors. Further, a review of the record shows that there was evidentiary support for the circuit court's findings. On appeal, "we may not retry the facts or substitute our view of the facts for those of the trial court." Ferguson, 14 Va. App. at 336. Here, the record supports the circuit court's determination that visitation with father without father completing certain conditions is contrary to L.C.M.'s best interests, and thus the court did not abuse its discretion in its determination regarding visitation.[7]

## C. Protective Order[8]

Father also contends that the two-year protective order entered by the circuit court was unjustified by the evidence, unreasonably disproportionate to the alleged harassing misconduct in which father was found to have engaged, and amounted to an abuse of discretion.

In making its ruling on the appeal of the protective order, the circuit court found that

> father appeared at [L.C.M.'s] basketball game on December 13, 2019, despite an order that precluded any contact with the child based on his past actions. [Father] had repeatedly violated this order in October and November by appearing at her games,

---

[7] Father argues that the court is only authorized to order no visitation between a parent and child when the situation involves "unusual circumstances," and here no unusual circumstances exist. This Court has stated, "Except under unusual circumstances, a child's best interests are served by maintaining close ties between him and his non-custodial parent." Kogon v. Ulerick, 12 Va. App. 595, 596 (1991). However, while acknowledging that maintaining close ties between a child and a non-custodial parent is an important objective, we have also stated, "Nevertheless, a court must terminate or restrict visitation when the child's best interests dictate that such action is warranted." M.E.D. v. J.P.M., 3 Va. App. 391, 397 (1986). In this case, the court correctly applied the best-interests standard to its determination regarding visitation, and we cannot say that the circumstances presented here were not the kind of "unusual circumstances" contemplated in Kogon.

[8] We address father's assignments of error five and six in this section of the analysis.

- 12 -

waiting in the halls for her, and at one point approaching her at a concession stand. [L.C.M.] had become fearful to such a point that they waited until they thought everyone was gone before going out in the parking lot to leave. On the evening of December 13, 2019, they went to their car thinking that everyone had left and were suddenly approached by the father in his car, pulling closely and parallel to theirs. He got out of the car and tried to talk to [L.C.M.], who moved to the other side of the car, and the mother locked the doors. He moved in front of the car and a friend began videotaping the incident with her phone. [L.C.M.] also began filming it in the car. The father yelled at the friend to stop and physically attempted to take the phone from her, in full view of [L.C.M.] and her mother. The mother and [L.C.M.] were fearful and distraught. The father has been charged with assault and battery of the friend. The evidence showed that the father had been the subject of another protective order in Montgomery County [Maryland] as a result of physically assaulting the mother.

The court then recited the definition of stalking found in Code § 18.2-60.3 before finding that

[i]n this case the [c]ourt has directly ordered the father to have no contact with the mother and minor child, and the mother has also indicated that she wished to have no contact with him. The father repeatedly violated this by following them or attempting to contact them, which has increased their fear of him to the extent of [L.C.M.] being afraid of him at the games at school and precautions being taken before leaving school. In light of the custody and visitation decision of this [c]ourt and these past actions, the [c]ourt finds that the protective order is appropriate and grants the mother's request for a two-year protective order that prohibits contact with the mother and daughter.

"On appeal, we construe the evidence in the light most favorable to wife, the prevailing party below, granting to that evidence all reasonable inferences fairly deducible therefrom." Wright v. Wright, 38 Va. App. 394, 398 (2002). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Pommerenke v. Pommerenke, 7 Va. App. 241, 244 (1988) (quoting Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)). "The trial court rather than the appellate court 'ascertains a witness' credibility, determines the

- 13 -

weight to be given to [the witness'] testimony, and has the discretion to accept or reject any of the witness' testimony.'" Brown, 30 Va. App. at 539 (alteration in original) (quoting Street v. Street, 25 Va. App. 380, 388 (*en banc*)).

A court may issue a protective order if it has found by a preponderance of the evidence that the petitioner has proven family abuse. See Code § 16.1-253.1(D). In pertinent part, Code § 16.1-279.1 states that "[i]n cases of family abuse . . . the court may issue a protective order to protect the health and safety of the petitioner and family or household members of the petitioner." "Family abuse" is defined by Code § 16.1-228 as "any act involving violence, force, or threat that results in bodily injury or places one in reasonable apprehension of death, sexual assault, or bodily injury and that is committed by a person against such person's family or household member."[9] Code § 16.1-228 further provides that "[s]uch act includes . . . stalking."

The criminal offense of stalking is defined in Code § 18.2-60.3(A):

> Any person . . . who on more than one occasion engages in conduct directed at another person with the intent to place, or when he knows or reasonably should know that the conduct places that other person in reasonable fear of death, criminal sexual assault, or bodily injury to that other person or to that other person's family or household member is guilty of a Class 1 misdemeanor.

There are three elements necessary to prove stalking under this statute, as follows:

> (1) the defendant directed his or her conduct toward the victim on at least two occasions; (2) the defendant intended to cause fear or knew or should have known that his or her conduct would cause fear; and (3) the defendant's conduct caused the victim "to experience reasonable fear of death, criminal sexual assault, or bodily injury."

Stephens v. Rose, 288 Va. 150, 155 (2014) (quoting Parker v. Commonwealth, 24 Va. App. 681, 685 (1997)).

---

[9] A "[f]amily or household member" includes "the person's . . . children" and "any individual who has a child in common with the person." Code § 16.1-228.

The circuit court found that mother and L.C.M. were entitled to a protective order in this case because mother had proved that father had stalked them. As mother proved by a preponderance of the evidence that father stalked her and L.C.M., we conclude that the circuit court did not err in issuing the protective order. See Stephens, 288 Va. at 155 (using the definition of "stalking" in Code § 18.2-60.3(A) to determine whether the circuit court erred in issuing a protective order pursuant to Code § 19.2-152.10, the statute governing protective orders not issued for family abuse).

In the instant case, there is no dispute that father directed his conduct toward mother and L.C.M. on at least two occasions. Father went to more than one of L.C.M.'s sports games in the fall of 2019 and waited for her in the hallways and parking lots. He approached L.C.M. at the concession stand at one game, then approached her while she was in mother's car in the high school parking lot on December 13, 2019. Father also was in contact with mother on December 13, 2019, as well as many previous incidents, including assaulting her in 2009 and chasing her in his car in August 2018.

As for the second element, considering the evidence in the record in the light most favorable to mother, we conclude that the evidence also supports the determination that father intended to cause fear or knew or should have known that his conduct would cause fear for mother and L.C.M. In 2009, mother received a protective order against father in Maryland after father physically abused her.

In April 2016, father and mother got into a physical fight at one of L.C.M.'s soccer games, with father initially pushing mother and taking her phone away. Mother and father then both got on the ground with father "squeezing" mother and then putting his arms around her neck while mother tried to get him off by biting him. In August 2018, father chased after mother's car while she was driving L.C.M. to a birthday party. At one point, father drove in front of mother

on the road and stopped so that she could not pass. Following the February 2019 JDR order, L.C.M. posted a quiz on Instagram asking, "My biggest fear is" and then listing, "(a) the dark, (b) scary movies, (c) mike v." Father was aware of this posting and asked L.C.M. to take it down, and L.C.M. told him that the "answer wasn't [father]." Father also sent a message to L.C.M. stating that mother had alleged to a potential visitation supervisor that father beat her and that L.C.M. was "scared" of father. He also sent her a message stating, "Choose wisely who you surround yourself with. Slow moving car crash."

In an August 2019 order, the circuit court ordered no further contact or visitation with father for the next forty-five days and that contact or visitation could only resume once L.C.M.'s therapist and visitation supervisor agreed that L.C.M. was "emotionally stable enough." The court specifically stated in its order that during the forty-five-day period, L.C.M., the GAL, L.C.M.'s therapist, and mother would "meet to help [L.C.M.] with the psychological harm caused by [father]." Father continued to contact L.C.M. after this order without getting approval from L.C.M.'s therapist or visitation supervisor. He called and sent text messages to L.C.M. during November 2019. Father was prohibited from contacting L.C.M., yet went to her sports games and waited in hallways and parking lots for L.C.M. to see him. On December 13, 2019, father also pulled up in his car very close to mother's car in a parking lot at night after one of L.C.M.'s basketball games and assaulted a family friend while mother and L.C.M. watched.

For Code § 18.2-60.3(A), "[t]he *mens rea* element is satisfied if the evidence shows the defendant *should have known* his conduct would cause fear." Stephens, 288 Va. at 156. We conclude that the record, including the evidence of father's previous physical abuse against mother in 2009 and his physical fight with her in 2016, his pursuit of mother and L.C.M. in a car chase, his knowledge of L.C.M.'s Instagram post referencing fear of him and his knowledge that mother reported that L.C.M. feared him, his contact with L.C.M. and mother at L.C.M.'s

sporting events despite the court order prohibiting him from attending following the court's finding that his actions were causing L.C.M. "psychological harm," and his assault of L.C.M.'s basketball coach in a parking lot at night in mother and L.C.M.'s presence were sufficient to prove that father reasonably should have known that his conduct placed mother and L.C.M. in reasonable fear of bodily injury.

The last element under Code § 18.2-60.3(A) is whether father's conduct caused mother and L.C.M. to experience reasonable fear of death, criminal sexual assault, or bodily injury. The standard for determining reasonable fear is "an objective one." Stephens, 288 Va. at 157. In addition, "[a] victim need not specify what particular harm she fears to satisfy the third element of stalking." Id.; see also Parker, 24 Va. App. at 685-86 (holding that although victim of stalking did not specify that she was afraid for her physical well-being, evidence "of the dynamics of her relationship" with defendant supplied the necessary context for the conclusion that she reasonably feared bodily injury under Code § 18.2-60.3). Here, L.C.M. reported to both police and Dr. Hoffman that she was afraid of father and did not want them to report back to him. She also reported to Dr. Hoffman that after the parties' physical fight in April 2016, she was "afraid that [father] w[ould] hurt [mother] really badly one day" and that she "can't tell him what I really think, or he might hurt me." When father chased mother in her car in August 2018, mother told the police she was "in in fear of [father's] actions," and L.C.M. pinched mother's arm in an effort to get her to not stop the car and told her, "Daddy is going to get me." L.C.M. created a "safety plan" with friends at school in case father arrived to ensure that she would not be alone with him. At one of her games, when father followed L.C.M. to a concession stand, L.C.M. reported that this "was very distressing for [her], and she fe[lt] like it's not a safe . . . situation and could become chaotic very quickly." During the December 13, 2019 incident at the high school parking lot, mother was "scared" and locked her car doors. L.C.M. was also "scared" and

- 17 -

"nervous" and "jumped on the other side of the backseat." Dr. Hoffmann testified that at the time of trial, L.C.M. was "scared" and "fearful" about testifying in court because father might "retaliate" against her. In addition, mother had previously been physically abused by father in 2009. This evidence is sufficient to satisfy the third element of stalking.[10]

Based on a review of the entire record, we conclude that, contrary to father's arguments, the evidence was sufficient to prove that in stalking mother and L.C.M. he committed an act of abuse against a family member under Code § 16.1-228, and therefore the court was authorized by Code § 16.1-279.1 to issue an order to protect mother and L.C.M.[11]

### D. Notice of Relocation

Father further argues that the circuit court erred as a matter of law and exceeded its discretionary authority under Code § 20-124.5 by ordering that, for good cause shown, mother need not comply at all with the statutory notice of relocation requirement.

---

[10] As noted above, to obtain a protective order for family abuse pursuant to Code § 16.1-279.1, a petitioner must prove that the person they are seeking an order against committed an act of "family abuse." Under Code § 16.1-228, "family abuse" is any act involving violence, force, or threat, including stalking, that also "results in bodily injury or places one in reasonable apprehension of death, sexual assault, or bodily injury." Father argues that his actions did not place mother nor L.C.M. in a reasonable apprehension of serious bodily injury. For the same reasons that we concluded that father should have known that his conduct would cause fear and that L.C.M. and mother experienced reasonable fear of bodily injury—the evidence of father's previous physical abuse against mother, his pursuit of mother and L.C.M. in a car chase, his contact with L.C.M. and mother at L.C.M.'s sporting events despite the court order prohibiting him from attending, and his assault of a family friend in a parking lot at night in mother and L.C.M.'s presence—we also conclude that his actions in stalking mother and L.C.M. placed both in a reasonable apprehension of serious bodily injury.

[11] To the extent that father argues that the two-year protective order issued against him for L.C.M. violates his Fourteenth Amendment due process right to parent his daughter, the order specifically disallows contact with L.C.M. "except as ordered by the circuit court or court of competent jurisdiction." Therefore, father would be able to resume a relationship with L.C.M. once he met the conditions of the circuit court's order, notwithstanding the existence of the protective order.

The circuit court ordered, pursuant to that statute, that father provide thirty days' advance written notice to the court and mother of any intention to relocate and of any intended change of address, but "[f]or good cause shown, namely, issuance of the aforementioned Protective Order against Father, Mother is not required to comply with these provisions."

Code § 20-124.5 provides as follows:

> In any proceeding involving custody or visitation, the court shall include as a condition of any custody or visitation order a requirement that thirty days' advance written notice be given to the court and the other party by any party intending to relocate and of any intended change of address, unless the court, for good cause shown, orders otherwise. The court may require that the notice be in such form and contain such information as it deems proper and necessary under the circumstances of the case.

Father asserts that this statute, when properly construed, does not grant authority to a trial court to entirely exempt a custodial parent from the notice requirement for relocations, even for good cause shown. Rather, father interprets the last sentence of the statute as mandating that there must be *some* sort of notice, but that it may be "in such form and contain such information" as the court deems necessary. In construing a statute, "[w]e look to the plain meaning of the statutory language, and presume that the legislature chose, with care, the words it used when it enacted the relevant statute." Fox v. Fox, 61 Va. App. 185, 196 (2012) (quoting Addison v. Jurgelsky, 281 Va. 205, 208 (2011)). Contrary to father's argument, a reading of the statute makes clear that a court can forgo the thirty days' notice requirement entirely, as the plain language of the statute provides that the requirement must be met "unless the court, for good cause shown, orders otherwise." Code § 20-124.5. By allowing the court to "order[] otherwise," the statute gives the court the authority to order that no notice be given at all.

In the instant case, the court found that good cause existed for waiving the requirement under Code § 20-124.5 that mother provide father with thirty days of advance notice of any intention to relocate and of any intended change of address. Based on the entire record,

including the protective order against father issued for mother and L.C.M., we conclude that the court did not err in its good cause determination.

## E. Attorney's Fees

Father asserts that the circuit court erred in awarding all of mother's attorney's fees and costs.

"This Court reviews an award of attorney's fees for an abuse of discretion." Koons v. Crane, 72 Va. App. 720, 742 (2021). Code § 16.1-278.19 governs the award of attorney's fees in the JDR courts and, as this case originated in the JDR court, applies here. See Code § 16.1-296(I) (providing that "[i]n all cases on appeal, the circuit court in the disposition of such cases shall have all the powers and authority granted by th[is] chapter to the juvenile and domestic relations district court"). At the time of the entry of the final order in this case, Code § 16.1-278.19 read, "In any matter properly before the court, the court may award attorneys' fees and costs on behalf of any party as the court deems appropriate based on the relative financial ability of the parties."[12]

Husband argues that the circuit court abused its discretion in awarding wife attorney's fees incurred following father's petitions for change in custody and visitation because the court failed to take into account the relative financial ability of the parties in calculating the attorney's fee award.

In its oral ruling, in regard to attorney's fees, the court noted that father testified in his deposition that he owned two properties, earned from $5,000 to $90,000 a year as a real estate agent, depending on the market, and supplemented his income by teaching golf. He refused to answer whether he had investment accounts or gifts or any other source of income. The court

---

[12] The attorney's fees award in this case occurred prior to the General Assembly's 2020 amendment to Code § 16.1-278.19 allowing for attorney's fees based upon the financial ability of the parties and "any other relevant factors to attain equity." 2020 Va. Acts ch. 185.

noted that there was testimony that mother had incurred fees and costs, that it was difficult for her to pay them, and that father presented no evidence of her income other than his unsupported allegations.

Father argues that the circuit court abused its discretion in failing to take into account the relative financial ability of the parties in calculating the attorney's fee award. However, from the court's oral ruling, it is clear that it considered all relevant factors to determine an appropriate fee award, including the parties' ability to pay in accordance with Code § 16.1-278.19. Thus, the court did not abuse its discretion in awarding mother her attorney's fees.

Attorney's Fees on Appeal

On appeal, mother asks to be awarded attorney's fees and her costs. On appeal, this Court "may award" some or all of the fees requested or "remand the issue to the circuit court . . . for a determination thereof." Rule 5A:30(b)(1)-(2). This Court declines mother's request for appellate attorney's fees.

III. CONCLUSION

We hold that the circuit court did not abuse its discretion in ordering no visitation for father unless certain conditions were met and that this determination did not constitute a *de facto* termination of father's parental rights. In addition, we hold that the circuit court did not err in issuing a protective order against father. The circuit court also did not err in determining that, for good cause shown, mother did not have to comply with the requirements of Code § 20-124.5. Finally, we conclude that the circuit court did not abuse its discretion in its award of attorney's fees to mother. Accordingly, we affirm.

Affirmed.